

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: February 19, 2024.**

_____
**SHAD M. ROBINSON**
**UNITED STATES BANKRUPTCY JUDGE**

---

### UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **WHITESTONE BREWERY, LLC** | § | **Case No.  23-10325** |
| | § | |
| **Debtor** | § | **Chapter 11 (Subchapter V)** |
| | § | |

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING PLAN OF REORGANIZATION

On February 15, 2024, the Court conducted a hearing on the confirmation of the Third Amended Subchapter V Plan of Reorganization dated January 5, 2024 ("Plan") [Dkt.#184] filed by Whitestone Brewery, LLC ("Debtor" or "Whitestone"). A copy of the Plan with exhibits and amendments thereto is attached as Exhibit A. This Court having considered the testimony and evidence presented and reviewed the Plan and, it appearing to the Court that the notice of the Confirmation Hearing and the opportunity for any party in interest to object to confirmation have been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby, and the legal and factual bases set forth

in the documents filed in support of confirmation and presented at the Confirmation Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefore, the Court, in addition to the findings of fact and conclusions of law set forth by the Court in its oral ruling on the record at the hearing on February 15, 2024, hereby FINDS, ADJUDGES, AND DECREES THAT[1]:

## I.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.  JURISDICTION AND VENUE.

1.  The Debtor commenced this chapter 11 case (the "Chapter 11 Case") on May 5, 2023 (the "Petition Date") by filing voluntary petitions for relief under subchapter V of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Venue in the United States Bankruptcy Court for the Western District of Texas, Austin Division (the "Bankruptcy Court") was proper as of the Petition Date pursuant to 28 U.S.C. §§ 1408 and 1409 and continues to be proper during the Chapter 11 Cases. Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2).  The Bankruptcy Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334. The Bankruptcy Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

### B.  ELIGIBILITY FOR RELIEF.

2.  The Debtor is an entity eligible for relief under § 109 and Subchapter V of Chapter 11 of the Bankruptcy Code.

---

[1] All capitalized terms used in this Confirmation Order shall have the meanings as defined in section 1.01 of the Plan unless such terms are otherwise defined in this Confirmation Order.

### C. JUDICIAL NOTICE.

3.      The Bankruptcy Court takes judicial notice of (and deems admitted into evidence for confirmation) the docket of the Chapter 11 case maintained by the clerk of the applicable court or its duly appointed agent, including all pleadings and other documents on file, all orders entered, all hearing transcripts, and all evidence and arguments made, proffered, or adduced at the hearings held before the applicable court during the pendency of the Chapter 11 case.

### D. TRANSMITTAL AND MAILING OF MATERIALS; NOTICE.

4.      Due, adequate, and sufficient notice of the Plan, and Confirmation Hearing, together with all deadlines for voting on or objecting to the Plan, has been given and no other or further notice is or shall be required.

### E. SOLICITATION.

5.      Votes for acceptance or rejection of the Plan were solicited in good faith and in compliance with § 1126 of the Bankruptcy Code, Bankruptcy Rule 3018, and all other applicable provisions of the Bankruptcy Code. Such transmittal and service were adequate and sufficient, and no further notice is or shall be required.

### F. VOTING CERTIFICATION.

6.      The tabulation of the ballots was conducted in accordance with the Bankruptcy Code. As evidenced by the Ballot Summary filed by the Debtor, one voting class of creditors voted to accept the Plan and one voting class rejected the Plan, the remaining creditor classes have been provided their statutorily prescribed treatment under § 1129(a)(9)(C) and (D) of the Bankruptcy Code in the Plan and have not voted to reject and have not objected to the Plan.

### G. COMPLIANCE WITH THE REQUIREMENTS OF § 1129 OF THE BANKRUPTCY CODE.

7. A plan proponent has the burden to prove the requirements for confirmation by a preponderance of the evidence. Here, the Debtor has satisfied its burden of proof with respect to confirmation of the Plan.

### (i) SECTION 1129(a)

8. The Plan (with any modifications as set forth below) and the Debtor have satisfied all applicable requirements for confirmation of the Plan under 11 U.S.C. § 1129(a), except for 11 U.S.C. § 1129(a)(8) and/or 1129(a)(10). However, the Plan can and should be confirmed under 11 U.S.C. § 1191(b), as the Plan does not discriminate unfairly and is fair and equitable with respect to each impaired class of claims and interests that have not accepted the Plan as required by 11 U.S.C. § 1191(c).

### (ii) SECTION 1129(d)—PRINCIPAL PURPOSE OF THE PLAN IS NOT AVOIDANCE OF TAXES.

9. No Governmental Unit has requested that the Bankruptcy Court refuse to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of § 5 of the Securities Act. As evidenced by its terms, the principal purpose of the Plan is not such avoidance. Accordingly, the Plan satisfies the requirements of § 1129(d) of the Bankruptcy Code.

### H. SATISFACTION OF CONFIRMATION REQUIREMENTS.

10. Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in § 1129 and Subchapter V of the Bankruptcy Code.

### I. GOOD FAITH.

11. The Debtor and its principals, agents, financial advisers, attorneys, employees,

affiliates, and representatives have been, are, and will continue to act in good faith if they proceed to: (a) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated thereby; and (b) take the actions authorized and directed by the Confirmation Order.

### J.  IMPLEMENTATION.

12.  All documents and agreements necessary to implement the Plan and all other relevant and necessary documents have been negotiated in good faith, at arm's length, and are in the best interests of the Debtor and the Reorganized Debtor and shall, upon completion of documentation and execution be valid, binding, and enforceable documents and agreements not in conflict with any federal or state law.

## II.  ORDER

**BASED ON THE FOREGOING FINDINGS OF FACT, IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

### A.  ORDER.

13.  This Confirmation Order confirms the Debtor's Plan dated January 5, 2024 (herein "Plan"), and any amendments thereto, as a non-consensual plan under § 1191(b) of the Bankruptcy Code. The terms of the Plan are incorporated by reference into, and are an integral part of, this Confirmation Order.

### B.  FINDINGS OF FACT AND CONCLUSIONS OF LAW.

14.  The findings of fact and the conclusions of law stated in this Confirmation Order, in addition to the findings of fact and conclusions of law set forth by the Court in its oral ruling on the record at the hearing on February 15, 2024, shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the proceeding by

Bankruptcy Rule 9014. To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law shall be determined to be a finding of fact, it shall be so deemed.

### C. CONFIRMATION OF THE PLAN.

15. The Plan and each of its provisions are confirmed in each and every respect pursuant to §§ 1191 & 1129 of the Bankruptcy Code. The documents referenced in the Plan and any amendments, modifications, and supplements thereto, and all documents and agreements related thereto, and the execution, delivery, and performance thereof by the Debtor are authorized and approved as finalized, executed, and delivered. Without further order or authorization of the Bankruptcy Court, the Debtor is authorized and empowered to make all modifications to all documents included as part of the Plan that are consistent with the Plan. As set forth in the Plan, once finalized and executed, the documents contemplated by the Plan shall constitute legal, valid, binding, and authorized obligations of the respective parties thereto, enforceable in accordance with their terms and, to the extent applicable, shall create, as of the Effective Date, all Liens and other security interests purported to be created thereby.

16. The terms of the Plan shall be effective and binding as of the Effective Date of the Plan.

### D. NOTICE OF ENTRY OF THE CONFIRMATION ORDER.

17. In accordance with Bankruptcy Rules 2002 and 3020(c), within three business days of the date of entry of the Confirmation Order, the Debtor shall serve the notice of confirmation, notice of the Effective Date of the Plan and notice of all bar dates and deadlines set forth in the Plan by CM/ECF; United States mail, first class postage prepaid; by hand; or by overnight courier service to all parties having been served with the Confirmation Hearing

Notice. Mailing of the Notice of Confirmation in the time and manner set forth in this paragraph shall be good and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c), and no other or further notice is necessary. Debtor shall promptly file a certificate of service of the Notice of Confirmation on CM/ECF.

18.     The Notice of Confirmation shall have the effect of an order of the Bankruptcy Court, shall constitute sufficient notice of the entry of the Confirmation Order to such filing and recording officers, and shall be a recordable instrument notwithstanding any contrary provision of applicable non-bankruptcy law.

19.     <u>Discharges, Releases, and Injunctions</u>.  The discharge, releases, and injunctions, moratoriums, limitations of liability, and covenants not to sue set forth in the Plan, are approved and authorized in their entirety.

20.     **EXCEPT AS OTHERWISE PROVIDED IN THIS CONFIRMATION ORDER, THE PLAN, OR BY ORDER OF THE BANKRUPTCY COURT, UPON CONFIRMATION OF THE PLAN (AND FROM AND AFTER THE EFFECTIVE DATE) ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR LIENS AGAINST, OR EQUITY INTERESTS IN, THE DEBTOR OR ITS PROPERTIES ARE PERMANENTLY RESTRAINED AND ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST THE ESTATE, THE DEBTOR, AND/OR THE REORGANIZED DEBTOR:  (A) COMMENCING OR CONTINUING, IN ANY MANNER, ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY CLAIM AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR RESPECTIVE ASSETS; (B) ENFORCING, ATTACHING,**

**COLLECTING, OR RECOVERING ON ACCOUNT OF ANY CLAIM BY ANY MANNER OR MEANS, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE REORGANIZED DEBTOR OR THE ASSETS, EXCEPT PURSUANT TO AND IN ACCORDANCE WITH THE PLAN; (C) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST EITHER THE ASSETS OR THE REORGANIZED DEBTOR; (D) ASSERTING ANY CONTROL OVER, INTEREST, RIGHTS OR TITLE IN OR TO ANY OF THE ASSETS, EXCEPT AS PROVIDED IN THE PLAN; (E) ASSERTING ANY SETOFF OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE THE REORGANIZED DEBTOR AS ASSIGNEES, EXCEPT UPON LEAVE OF THE BANKRUPTCY COURT OR EXCEPT AS AUTHORIZED BY BANKRUPTCY CODE SECTION 553; AND/OR (F) PERFORMING ANY ACT, IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN; PROVIDED, HOWEVER, THAT THIS INJUNCTION SHALL NOT BAR ANY CREDITOR FROM ASSERTING ANY RIGHT GRANTED PURSUANT TO THE PLAN; AND PROVIDED FURTHER, HOWEVER, THAT EACH HOLDER OF A CONTESTED CLAIM SHALL BE ENTITLED TO ENFORCE ITS RIGHTS UNDER THE PLAN, INCLUDING SEEKING ALLOWANCE OF ITS CONTESTED CLAIM PURSUANT TO THE PLAN.**

      E.       **BINDING EFFECT.**

      21.      Notwithstanding Bankruptcy Rules 3020(e), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtor, the Reorganized Debtor, and any and all

holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Persons that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Person acquiring property under the Plan, and any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors.

22.     The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Person.

### F.     SPECIAL SUBCHAPTER V PROVISIONS

23.     **Debtor as Disbursing Agent**: The Plan is confirmed pursuant to 11 U.S.C. § 1191(b) as a non-consensual Plan of Reorganization for the Debtor. Notwithstanding the provisions of 11 U.S.C. § 1194(b), the Debtor shall serve as the Disbursing Agent and will be responsible for making all payments to creditors and other parties in interest under the Plan.

24.     No later than 14 days after the Plan is substantially consummated, the Debtor shall file with the Court and serve upon the Subchapter V Trustee, U.S. Trustee, and all parties in interest, notice of substantial consummation of the Plan as provided under 11 U.S.C. § 1183(c)(2).

25.     On the Effective Date of the Plan, the injunction imposed under the terms of this Plan and Confirmation Order shall apply to any and all pre-petition claims against the Debtor, except that the default provisions of the Plan apply to all creditors, unless the Plan or this Confirmation Order states otherwise. Upon completion of payments to the allowed claims under the Plan, the Debtor shall be discharged to the extent provided by 11 U.S.C. § 1192. All property

of the estate shall remain vested in the estate until the Debtor completes all the payments under the Plan and a discharge is entered herein. In addition, property of the estate shall include all property identified in 11 U.S.C. § 1186.]

26.    If the Debtor's bankruptcy case is subsequently converted to Chapter 7, all property of the Reorganized Debtor in the converted case shall automatically revest and become property of the bankruptcy estate of the Debtor in the converted Chapter 7 case.

**Subchapter V Trustee Specific Provisions**

27.    The Subchapter V Trustee shall file all reports required by 11 U.S.C. §§ 1183(b)(1) and 704(a)(9) in the manner prescribed by the United States Trustee Program. Upon the completion of the Plan, the Subchapter V Trustee shall file their final report and seek a discharge of their duties as Subchapter V Trustee.

28.    The Subchapter V Trustee shall be compensated for their post-confirmation duties at their approved hourly rate. The Subchapter V Trustee may file a notice setting forth post-confirmation fees and expenses on a quarterly basis with the Court. All parties in interest will have fourteen (14) days after the notice is filed to object to the Subchapter V Trustee fees and expenses disclosed therein. If no objection is received, the Debtor shall pay the Subchapter V Trustee without further order of the Court.

29.    The Subchapter V Trustee shall file a post-confirmation final fee application within ninety (90) days of the notice of completion of plan payments.  The final fee application shall include all compensation received and disclosed in the quarterly post-confirmation notices filed with the Court.

30.    Pursuant to 11 U.S.C. § 1192, within thirty (30) days of the filing of the Sub V Trustee's NDR or TFR, the Debtor shall file a motion for entry of the discharge order.  In the

motion for entry of discharge, the debtor shall certify that (1) all payments required under the confirmed plan have been made, (2) all administrative expenses, including the approved fees and expenses of the Subchapter V Trustee have been paid in full, and (3) that the debtor is entitled to entry of discharge.

31.     The Effective Date of the Plan shall be February 30, 2024.

G.     **PLAN CLARIFICATIONS**

32.     **Provisions Specific to Texas Comptroller**- Notwithstanding anything else to the contrary, Notwithstanding anything else to the contrary in the Plan or Confirmation Order, these provisions will govern the treatment of the claims of the Comptroller of Public Accounts (the "Comptroller"): (1) nothing provided in the Plan or Confirmation Order shall affect or impair any statutory or common law setoff rights of the Comptroller in accordance with 11 U.S.C. § 553; (2) nothing provided in the Plan or Confirmation Order shall affect or impair any rights of the Comptroller to pursue any non-debtor third parties for tax debts or claims, and the Comptroller specifically opts out of any third party releases or injunctions, if any; (3) nothing provided in the Plan or Confirmation Order shall be construed to preclude the payment of interest on the Comptroller's administrative expense tax claims; (4) to the extent that interest is payable with respect to any administrative expense, priority or secured tax claim of the Comptroller, the interest rate shall be the statutory interest rate, currently 9.5% per annum; and (5) nothing provided in the Plan or Confirmation Order impacts the governmental claims bar date, and Comptroller may amend their claims at any point.

33.     The Comptroller shall not be required to file any proof of claim, motion, or request for payment to be paid for any administrative claims. The Comptroller and TWC shall not be required to file any proof of claim, motion, or request for payment to be paid for any

obligations that arise or have arisen in the ordinary course of the Debtor's business, including all post-petition taxes incurred by the Debtor and/or Reorganized Debtor after the Petition Date. All post-petition taxes owed to the Comptroller shall be paid in full with applicable interest on or before the Effective Date, or as otherwise agreed by the Comptroller. If any post-petition taxes or Administrative Claims owed to the Comptroller are not due on the Effective Date, then such post-petition taxes or Administrative Claim shall be paid in the ordinary course of business in accordance with applicable law.

34.     All priority tax claims owed to the Texas Comptroller shall be paid in full either (1) on the Effective Date; (2) in equal monthly installments of principal and interest no later than sixty (60) months of the Debtor's bankruptcy petition date, with the first payment due on the Effective Date and every month thereafter on that same day of the month; or (3) as otherwise agreed to by the Comptroller. The Comptroller's priority tax claims shall accrue interest at the statutory rate of interest, currently 9.5% per annum until paid in full.

35.     A failure by the Debtor or Reorganized Debtor to make a plan payment to an agency of the State of Texas shall be an Event of Default. If the Debtor or Reorganized Debtor fails to cure an Event of Default as to an agency of the State of Texas within five (5) days after service of a written notice of default by email to counsel for Debtor at theadden@haywardfirm.com then that agency may (a) enforce the entire amount of its claim; (b) exercise any and all rights and remedies available under applicable non-bankruptcy law; and (c) seek such relief as may be appropriate in this court.  The Debtor and/or Reorganized Debtor can receive up to three (3) notices of default, however, the third default cannot be cured. The Texas Comptroller preserves all available bankruptcy and state law remedies, if any, in the event of default of payment on claims as laid out herein above.

36.     Debtor and/or Reorganized Debtor shall file all delinquent returns due and owing to Texas Comptroller on or before Effective date and stay current on filings thereafter. Notwithstanding anything to the contrary in the Plan or this Order, the Debtor and/or Reorganized Debtor will retain documents for the four-year inspection period set forth in Texas Tax Code § 111.0041(a) (or for any pending audits, the later of four years or the time any and all claim(s) based on such audit are resolved).

37.     **Provisions Specific to Williamson County**- Notwithstanding any other provision in the Plan or this Confirmation Order, Williamson County shall retain its 2023 and 2024 tax liens.

38.     The debt owed to Williamson County shall incur interest at the rate of 12% per annum and the fifth payment provided for in Debtor's Plan Payment Projections attached to the Plan as Exhibit A, shall be $1,364.27.

39.     **Reporting Requirements**- Debtor shall timely file the January Monthly Operating Report ("MOR") as well as the last MOR through the effective date on or by the 20th day of the following month.

40.     **Default Provisions**- Conversion of the Bankruptcy Case to Chapter 7 shall be an additional remedy for default.

41.     **Retention of Jurisdiction**- This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

## H.     FINAL CONFIRMATION ORDER

42.     This Confirmation Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

IT IS SO ORDERED.

### END OF ORDER ###

PREPARED BY

**HAYWARD PLLC**

*/s/ Todd Headden*
Todd B. Headden
  Texas Bar No. 240960285
  THeadden@HaywardFirm.com
7600 Burnet Rd., Suite 530
Austin, Texas 78757
(737) 881-7100 (*telephone/facsimile*)

**COUNSEL FOR THE DEBTOR**

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Case No. 23-10325 |
|   WHITESTONE BREWERY, LLC, | § | |
| | § | |
|   Debtor. | § | Chapter 11 |
| | § | Subchapter V |

---

## DEBTOR'S THIRD AMENDED SUBCHAPTER V PLAN OF REORGANIZATION

---

DATED: January 5, 2024

**HAYWARD PLLC**

Charlie Shelton
State Bar No. 24079317
Todd Headden
State Bar No. 24096285
7600 Burnet Road, Suite 530
Austin, TX 78757
(737) 881-7101 (Phone/Fax)
Email: cshelton@haywardfirm.com,
theadden@haywardfirm.com

***Counsel for Whitestone Brewery, LLC***

## Article 1
### Definitions and Use of Terms

**1.01** **Defined Terms**. Unless the context otherwise requires, capitalized terms shall have the meanings set forth in this Section 1.01.

(a) **Administrative Expense Claim** means an administrative expense or Claim described in 11 U.S.C. § 503, that arose on or after May 5, 2023 in the Bankruptcy Cases and that is entitled to administrative priority under to 11 U.S.C. § 507(a)(1), including but not limited to Claims for compensation of professionals made pursuant to 11 U.S.C. §§ 330 and 331, and all fees and charges assessed against the Debtor and the Debtor's property under 28 U.S.C. § 1930.

(b) **Allowed Claim** means either: (i) a Claim against the Debtor or its property that is allowable under the Bankruptcy Code to the extent that a proof of claim, proof of interest, or request for payment was timely filed or, with leave of the Bankruptcy Court, was late filed and as to which no objection has been filed or, if an objection has been filed, is allowed by a Final Order, unless otherwise provided in this Plan, or (ii) a Claim against the Debtor or its property that is scheduled and not listed as disputed, contingent or unliquidated, and as to which Claim no objection has been filed or, if an objection is filed, is allowed by a Final Order.

(c) **Bankruptcy Cases** means the above-captioned Chapter 11 case pending in this Bankruptcy Court.

(d) **Bankruptcy Code** means the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

(e) **Bankruptcy Court** means the United States Bankruptcy Court for the Western District of Texas, Austin Division, or such other Court that may have jurisdiction with respect to Debtor's Bankruptcy Case.

(f) **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure, as amended, promulgated under 28 U.S.C. § 2075, and the Local Rules of the Bankruptcy Court, as applicable from time to time to the Debtor's Bankruptcy Cases.

(g) **Bar Date** means the dates subsequent to which proof of a pre-petition Claim against the Debtor may not timely be filed or, with respect to proofs of claims held by governmental agencies, the dates by which those must be filed. The Bar Date for government agencies' Claims is November 1, 2023 and the Bar Date for all other Claims is July 14, 2023.

(h) **Claim** means (i) any right to payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (ii) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

(i) **Claimant** means any Person or entity having or asserting a Claim in the Bankruptcy Case.

(j) **Class** or **Classes** mean all of the holders of Claims or Equity Interests that the Debtor has designated pursuant to 11 U.S.C. § 1123(a)(1) as having substantially similar characteristics as described in Articles VI and VII of this Plan.

**(k) Confirmation** means the entry by the Bankruptcy Court of the Confirmation Order.

**(l) Confirmation Date** means the date on which the Confirmation Order is entered.

**(m)Confirmation Order** means the order of the Bankruptcy Court confirming the Plan pursuant to 11 U.S.C. § 1191.

**(n) Contested Claim** means a Claim against the Debtor or its property that either (a) is listed in the respective Debtor's schedules of assets and liabilities as disputed, contingent or unliquidated; (b) is the subject of a pending action in a forum other than the Bankruptcy Court, unless such Claim has been determined by Final Order in such other forum and Allowed by Final Order of the Bankruptcy Court; or (c) has had or is subject to a pending objection or request for estimation filed by the Debtor or by any other party in interest in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**(o) Creditor** shall have the meaning specified by 11 U.S.C. § 101(9) of the Bankruptcy Code.

**(p) Debtor** means Whitestone Brewery, LLC. Debtor is a Texas limited liability company. Debtor continues to serve as a debtor in possession in the Bankruptcy Case.

**(q) Effective Date** means the fifteenth day after the Confirmation Order becomes a Final Order, or as specified in the Confirmation Order.

**(r) Estate** means the estate of the Debtor created pursuant to 11 U.S.C. § 541.

**(s) Equity Interests** means the interest of the Members of Whitestone Brewery, LLC, and all rights associated therewith, and all Claims arising from or relating to such Equity Interests, including but not limited to Claims for rescission.

**(t) Final Order** means an order or judgment entered by the Bankruptcy Court or any other court exercising jurisdiction over the subject matter and the parties, as to which the time to appeal (generally, fourteen days after entry) has expired and as to which a stay pending appeal has not been granted.

**(u) General Unsecured Claim** means an Unsecured Claim that is not entitled to priority under 11 U.S.C. § 507(a).

**(v) Insider** has the meaning in § 101(31) of the Code. Insiders of the Debtor include, but are not necessarily limited to, Ryan Anglen, Danielle Anglen, and Ryan van Steenis.

**(w)Lien** shall mean a contractual or statutory lien against or security interest in any Property of the Estate.

**(x) Person** means an individual, partnership, or corporation, but does not include a governmental unit unless the government unit acquires an asset as a result of operation of a loan guarantee agreement, or as receiver or liquidating agent, in which case such governmental unit shall be considered a Person for purposes of 11 U.S.C. § 1102.

**(y) Petition Date** means May 5, 2023 and is the date on which the Debtor filed its petition for relief, commencing the Bankruptcy Case.

**(z) Plan** means this Subchapter V Plan of Reorganization dated January 5, 2024, as it may be amended, modified or supplemented by the Debtor from time to time as permitted herein and by the Bankruptcy Court.

**(aa)       Priority Creditor** means a Creditor whose Claim is entitled to priority under 11 U.S.C. § 507.

**(bb)       Property of the Estate** means all property in which the Debtor holds a legal or an equitable interest, including all property described in 11 U.S.C. § 541.

**(cc)** **Ordinary Course Professionals** means professionals hired by the Debtor pursuant to Court Order, including Hayward PLLC and Vine Financial Partners, LLC.

**(dd)** **Reorganized Debtor** refers to the new entity that emerges following Confirmation of the Plan, which shall be an entity with the same names as previously.

**(ee)** **Secured Claim** means any Claim secured by a Lien or other charge or interest in property in which the Debtor have an interest, to the extent of the value thereof as determined in accordance with 11 U.S.C. § 506(a).

**(ff)** **Secured Creditor** or **Secured Claimant** means any Claimant holding a Secured Claim.

**(gg)** **Unsecured Claim** means a Claim that is not a Secured Claim.

**(hh)** **Unsecured Creditor** or **Unsecured Claimant** means any Claimant holding an Unsecured Claim.

**1.02** **Terms Defined in the Bankruptcy Code**. Capitalized terms not specifically defined in Section 1.01 of the Plan shall have the definitions, if any, given those terms in the Bankruptcy Code.

## Article 2
## Background and Summary for Debtor's Bankruptcy Case

### A. Description and History of Debtor's Business

**2.01** Debtor is a Texas Limited Liability Company which historically operated a brewery and two taprooms. The main production facility and tap room has been located at 601 E. Whitestone Blvd., Cedar Park, Texas 78613 (the "Cedar Park location"). Debtor produces a variety of beers with several year-round regular options including smooth and refreshing blondes, Kolsch, and lagers, to more flavor forward choices such as a hefeweizen and an I.P.A. Seasonal varieties include: brown ales, imperial stouts, hazy IPAs, west coast IPAs, amber ales, etc. In addition to the above, Whitestone recently started producing two versions of a non-alcoholic carbonated drink call "HopWater". This new option is dry-hopped, so it packs much of the flavor of beer, but comes with zero calories, sugar, carbs, or alcohol.

### *Early Years of the Business (2016 Through to COVID Pandemic)*

**2.02** The Debtor was formed on November 13, 2014 to own and operate a brewpub at the Cedar Park location. After a year of renovations to the Cedar Park location which included building out a taproom, Debtor opened its doors for business on January 1, 2016. Ryan and Danielle Anglen formed Whitehouse Brewery to serve as a place for friends, neighbors, and the

community to gather over a tasty pour. To help foster that atmosphere, Debtor crafted a strong connection by hosting numerous charity events with numerous local non-profits, donating their products for local fundraisers as well as partnering with police, fire and first responders each year. Since opening, they have received several local "Best of the Best" awards by the Hill Country News, an entrepreneurial award by their local Chamber of Commerce. Additionally, the principals have served on the Board of their local Chamber of Commerce and maintained a very active role in their local business community.

2.03    Like many aspiring and hungry businesses, things were looking hopeful for Whitestone as it survived the first four years of operation and eyed the future.

### *Surviving the COVID Pandemic and Growth*

2.04    At the outset of the COVID pandemic in March 2020, Debtor had grown to employ 18 team members and generated approximately $1,365,000 in annual sales. During the Covid-19 pandemic their original Cedar Park location was forced to close for three months, during which they were only able to sell "beer to go" which previously represented a small portion of revenue.

2.05    Debtor welcomed the opportunities provided via the Paycheck Protection Program, Employee Retention Credits and also the SBA EIDL loan to keep the business operational. Shortly after reopening, the Debtor was able to gain needed warehouse space in Liberty Hill, 18 miles north of the Cedar Park location, with the intention of making bulk purchases of supplies to reduce costs. However, with the global supply chain challenges and significant cost increases to supplies and raw materials as the world navigated how to move on from the Covid-19 pandemic, the intended savings never materialized. Despite those challenges, Debtor rebounded through the Covid-19 pandemic to have their highest gross sales year in 2021. Only to repeat that feat again in 2022.

2.06    Based upon its successes in 2021 and the growth in 2022, Debtor decided to open a second taproom at their warehouse, located at 15390 W State Hwy 29, Liberty Hill, TX, 78642 (the "Liberty Hill location").

### *Expansion Delays Created a Cash Crunch*

2.07    In spring of 2022, Whitestone commenced work to buildout the Liberty Hill

location. The intention was to make have a second taproom in a growing area of central Texas with the added benefit of having space to produce the non-alcoholic HopWater. Debtor hired a general contractor that was approved by the landlord and worked on a design plan and budget. Despite the plans, the contractor failed to properly submit permits, causing the project to be significantly delayed. In addition to the delays, the work completed was 125% over budget. For various reasons, Debtor fired the first general contractor in summer of 2022.

2.08    Debtor then coordinated with City officials to hire a contractor that was approved by Liberty Hill and the landlord. Given the lack of diligence by the first contractor. The new contractor, LOP Restoration, was required to obtain architectural drawings and remove most of the work performed by the first contractor. Given the administrative errors and wait for proper paperwork, the construction was halted for several months. It took the new contractor an additional 5 months to obtain corrected architectural drawings, submit the proper paperwork for the permits and, get authorization to proceed with the buildout. Once the city approved the permits, the new contractor was able to complete the work in 3 months. The Liberty Hill location was ready to open in March of 2023.

2.09    Due to the delays, increased costs and unexpected expenses, Debtor began borrowing in August, 2022, which coincided with the start of the new contractor commencing their work and continuing to completion in March of 2023. In total, the construction project was budgeted at $75,000 and the final total came in at just over $300,000. Adding to the financial injury, the City of Liberty Hill also added a $35,000 impact fee in order for the Debtor to receive their official Certificate of Occupancy. Finally, Debtor opened the Liberty Hill location on March 17, 2023.

2.10    To cover the difference from the budgeted cost and the total cost, the Debtor took out a number of short term loans at very high interest rates known as merchant cash advances ("MCAs"). Many of the loans required significant daily or weekly draws which severely restricted the cash flow of the business and directly led to Whitestone needing to file bankruptcy to stem the cash flow losses.

*Postpetition Events*

2.11    Since filing for bankruptcy, the Debtor continued to operate as a brewpub at the

Cedar Park location and worked hard to grow it's profile at the Liberty Hill location. In order to sustain the business and meet its payroll obligations, the Debtor took on a DIP Loan in the amount of $27,000 from Mr. John Nelson, who is also a principal behind Celis Brewery, a potential collaborator. The Debtor received and used the entirety of the DIP Loan to help pay employees over the historic summer slowdown in business.

2.12    Debtor continued to operate the brewery and two taprooms during the last several months since the Petition Date. However, the historical uptick in the taproom sales did not materialize as expected in September, after the summer lull. This coincided with a hotter than usual September, but sits with a backdrop of other local breweries shutting their doors amid declining sales. Due to the break from the historical seasonal pattern coupled with the broader troubles for craft brewery market, the Debtor asked the Court for an opportunity to amend its First Amended Plan while it reassessed its strategy. The Debtor filed a Second Amended Plan which explained that the Debtor intended to enter into a production partnership that would leverage cost savings and that Whitestone would cease to brew beer directly. Due to additional changes in the business strategy of Whitestone, at the Confirmation Hearing on December 21, 2023 the Court directed Whitestone to solicit confirmation of a Third Amended Plan that better advised the creditors of the Debtor's future business strategy. To successfully reorganize, Whitestone has

2.13    **Cedar Park Location**: For a variety of reasons, Whitestone decided that it is in the best interest of the Debtor, its creditors, and the bankruptcy estate to vacate the Cedar Park location and will, instead, seek Court authorization to enter into a lease agreement in an adjacent property which will be virtually "turnkey," meaning that Whitestone does not need to make any improvements to the premises. At the new Cedar Park Location (the "New CP Location"), Debtor intends to take over a recently vacated restaurant in an adjacent property at 401 East Whitestone Blvd. and will enter an arrangement with 600 Degrees Pizzeria ("600 Degrees"), a local establishment, to co-operate the new location.  The pertinent terms of the lease are as follows:

2.14    Whitestone believes the New CP Location to be superior to the original Cedar Park location because it is more prominent on Whitestone Blvd., has better parking for our patrons, the footprint of the facility is more inline with Whitestone's needs, and, most importantly, allows Whitestone to work with 600 Degrees Pizzeria ("600 Degrees"). Whitestone has struggled to partner with a food truck vendor that can provide reliable and consistent quality offerings to our clients. 600 Degrees will also allow Whitestone to expand its hours of operation to open for lunch

and expand its to-go offerings, which has not historically been a focus of Whitestone's. By operating out of a shared space with 600 Degrees, Whitestone will have solved a number of significant shortcoming of the original Cedar Park location.

2.15    By relocating to the New CP Location, Whitestone will not have to "cure" the pre-petition lease arrears, which exceeds over $100,000, which was a requirement from the landlord, Cedar Park Railyard, Inc. to enter into a new lease. In short, relocating will allow Whitestone to reduce the monthly overhead, remove the burden of curing $100,000 in pre-petition lease payments, improve its visibility, and allow us to increase revenue by creating synergies with a successful pizzeria.

2.16    **Brewing Arrangement with Celis Brewery**: In order to reduce overhead, the Debtor and its principals have been negotiating a production partnership with FFBC Operations LLC (dba Celis Brewery)("Celis Brewery") a local brewery. The contract brewing agreement ("Agreement") with Celis Brewery will allow the Debtor to leverage cost savings from bulk sales. In order to complete this Agreement, the managing members of Whitestone will need to create a new entity to serve as the contractee with Celis Brewery so that Whitestone can continue operating as a taproom. The new entity, WS Beverages, LLC, will be owned by Ryan Anglen and Ryan van Steenis, the managing members of Whitestone.  Given this arrangement, royalties will be paid to Whitestone as included in the Plan Projections. WS Beverages LLC will have some operational expenses, all net proceeds will come to Whitestone in support of the Plan and the reorganization process. This Agreement will allow Whitestone to cease brewing and focus on selling beer and fostering the community spirit that the driver of Debtor's initial success. Accordingly, Whitestone will no longer need its brewing equipment and will liquidate those assets and pay down the claim owed to its senior secured creditor, Third Coast Bank, SSB.

### Article 3
### Plan Summary

3.01    This Plan proposes to pay the Debtor's creditors from future income. This Plan provides for:

4 Classes of Secured claims;

1 Class of Secured Ad Valorem Taxes;

1 Class of Priority Unsecured Claims;

1 Class of General Unsecured Creditors; and

1 Class of Equity security holders.

3.02 General unsecured creditors holding allowed claims will receive distributions. The Plan proposes to pay the general unsecured creditors a pro-rata share of approximately $100,800 via monthly payments beginning in month 28 of the plan and continuing through the end of the Plan. This Plan also provides for the payment of certain Secured Claims, Administrative Expense Claims and Priority Claims.

**All creditors and equity security holders should refer to Articles 6 through 7 of this Plan for information regarding the precise treatment of their claim. Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

### Article 4
### Means of Implementation and Ability to Make Plan Payments

**4.01    Continued Operations**. The Debtor, as a reorganized debtor, will retain all property of the Estate. The retained property shall be used and employed by the Debtor in the continuance of its business. The operating Debtor shall fund the Plan payments to Creditors from: 1) disposable income derived from future business operations;2) the liquidation of various assets no longer necessary for future business operations; and 3) the recovery of approximately $19,500 in reimbursement expenses from the landlord of the Liberty Hill location for fixes made by the Debtor that were the landlord's responsibilities. Based upon the projection of profits from Debtor's business operations, the Debtor will have sufficient funds to use for payments to Creditors after Confirmation of the Debtor's Plan.

The management after confirmation of the Plan shall remain as it was immediately preceding the initiation of the instant case. Namely, the following persons shall continue to serve in the roles indicated:

Ryan Anglen - Owner/Operator/ Managing Member

Danielle Anglen - General Manager/Owner/Member

Ryan Van Steenis - Manager and Counsel

**4.02** **Debtor's Financial Projections.** A detailed analysis of the Debtor's projected income and expenses is set forth on the Projected Proforma referenced as **Exhibit A**. The Debtor's financial projections show that the Debtor will have sufficient projected disposable income (as defined by § 1191(d) of the Bankruptcy Code) for the duration described in § 1191(c)(2).

The Debtor believes the Plan is feasible based upon the projected revenue of the Debtor's business and the financial condition of the Debtor. The financial projections for the Debtor represent management's best estimation of the anticipated results of future operations based upon management's experience in the industry and its familiarity with the local market due to having operated the Debtor multiple years now. Despite the Debtor's best efforts, no one can guarantee that such projections will be realized or achieved and therefore creditors and other parties-in-interest should limit their reliance on such financial projections.

**4.03** **Advance Payment of Claims.** Debtor may, in its own business judgment, make advance payments on Allowed Claims and must stay current on payments to all creditors under the plan.

**4.04** **Consensual post-confirmation modification of plan terms**. Notwithstanding any provision set forth in this Plan, the Debtor and any particular Creditor provided for in this Plan may enter into any agreement(s) after confirmation which modifies that Creditor's treatment and payment terms, so long as such agreement is reduced to writing and signed by the Debtor's and consenting Creditor's authorized representatives. In such event, any modified agreement shall be deemed to supersede the terms of this Plan. For the avoidance of doubt, any such modification shall not impair the Debtor's ability to continue making the ongoing payments proposed under the Plan to the other creditors.

## <u>Article 5</u>
### Liquidation Analysis

**5.01** The Court must find that all creditors and equity interest holders will receive at least as much under the Plan as they would receive in a chapter 7 liquidation process. Debtor's liquidation analysis is attached to the Plan as **Exhibit B**. The liquidation analysis assumes conversion of the Debtor's Chapter 11 case to a chapter 7 liquidation case on December 29, 2023, wherein it is assumed that the United States Trustee would appoint a chapter 7 trustee to liquidate the Debtor's bankruptcy estate.

5.02    The liquidation analysis assumes the value that a chapter 7 trustee would obtain for the property of the Debtor in a hypothetical liquidation and reflects the Debtor's estimates on the potential recoveries for the different categories of property. The administrative expenses assumed therein consist of claims entitled to administrative expense priority under section 503 of the Bankruptcy Code, including the chapter 7 trustee's statutory fees and professional expenses in liquidating the estate.

5.03 Further, Debtor's true value is as a going-concern business. The Debtor believes that liquidation under Chapter 7 would result in lower distributions to the Debtor's secured and priority claimants and no distribution to the unsecured creditors. Some of the Debtor's secured creditors would have the right to exercise their rights as a secured creditor to repossess and foreclose upon the Debtor's assets, and such creditors could hold significant deficiency claims upon any such repossession or foreclosure. With respect to any remaining assets, and if a receiver or trustee were appointed to supervise the liquidation of the Debtor's assets, there would be significant costs associated with such liquidation. It is unlikely that the liquidation of Debtor's assets would be sufficient to enable a hypothetical trustee to make any significant distribution to unsecured creditors or deficiency claims of secured creditors because Administrative and Priority Claims, Secured Tax Claims, and the Secured Claims of the Debtor's equipment lenders would consume all such proceeds.


## Article 6

**Treatment of Administrative Expense Claims, Priority Tax Claims, and Statutory Fees**

Classification- Claims and Equity Interests are classified and treated as follows:

**6.01    Administrative Expense Claims.**

Administrative Expense Claims consist of expenses incurred during the chapter 11 case, which are approved by the Bankruptcy Court and expenses incurred in operating the Debtor's business. Most Administrative Expense Claims consist of claims by professionals employed by the Debtor in the Bankruptcy Case, which must be approved by the Bankruptcy Court. Other Administrative Expense Claims are claims arising post-petition, which may have not been paid. The Debtor intends to continue to pay normal post-petition operating expenses as they become due in the ordinary course of business. Debtor is aware of the following Administrative Claims:

| | |
|---|---|
| Subchapter V Trustee- Eric Terry | Est. $9,000<br>Est. retainer held on December 29, 2023: $5,000 |
| Hayward PLLC | Est. $100,000 as of December 29, 2023.<br>Current retainer held by Hayward: $21,079.50. |
| Vine Financial Partners, LLC (Bookkeeper) | Current- Paid as Ordinary Course Professional |

Debtor may also need to retain a professional, Mr. Bill Dufour, to represent it in the final negotiation with Celis Brewery, the intended brewing partner. Fees are estimated to run $8,000.

No Administrative Expense Claims (other than for the U.S. Trustee fees) shall be allowed except pursuant to Court order. Other than with respect to governmental units entitled to an administrative expense for the payment of an expense described in 11 U.S.C. § 503(b)(1)(B) or (C), any application for allowance of an administrative expense claim shall be filed within 60 days after the Effective Date or shall be barred.

Other than with respect to any Administrative Expense claims of Hayward PLLC and John Nelson, each of which are addressed herein, all Allowed Administrative Expenses shall be paid in full on the later of (a) the Effective Date (or as soon as practicable thereafter); (b) the date on which the Bankruptcy Court enters an order allowing such Administrative Expense; or (c) such other date to which the Debtor and the administrative claimholder agree.

### *Hayward PLLC*

The Debtor will pay any Allowed Administrative Expenses of Hayward PLLC remaining owing after its application of any funds held in retainer as follows:

Beginning fifteen (15) days after the date on which the Bankruptcy Court enters an order allowing such Administrative Expense, the Debtor shall make monthly payments to Hayward PLLC, initially in the amount of $1,000, and increasing in the later years of the repayment plan until the Administrative Expense Claim is paid in full. Payment of Hayward's allowed fees may exceed the duration of the proposed  Plan payments.

### *John Nelson*

The Allowed Administrative Expense Claim of John Nelson is treated in Class 4 below.

**6.02 Priority or Secured Tax Claims**. Each holder of an Allowed Secured and Priority Claims of Taxing Authorities will be paid in accordance with the treatment set forth below.

**6.03 Statutory Fees.** All fees required to be paid under 28 U.S.C. § 1930 that are owed on or before the effective date of this Plan have been paid or will be paid on the effective date.

<u>**Article 7**</u>

**Treatment of Claims and Interests Under the Plan**

The following classes of claims are based upon the proofs of claims filed against the Debtor and claims included in the filed schedules. Debtor has indicated proposed Plan payments in its Proforma attached as Exhibit A.

7.01 **Class 1 – Claims Secured by All of Debtor's Assets**.

As set forth herein, the Debtor believes its assets would yield a liquidation value net of expenses of $277,948.17. Based thereon, and subject to the Debtor's rights to object to any asserted claims, the claims of the following creditors shall be treated as indicated:

***Third Coast Bank SSB***

Third Coast Bank SSB's ("Third Coast") Claim is a first-position, fully secured Claim secured by substantially all of the Debtor's assets and will be modified. Third Coast's fully Secured Claim includes all allowed pre-petition and post-petition interest (if unpaid on the Effective Date), attorneys' fees, and expenses. Third Coast will maintain and retain all pre-petition collateral and all collateral granted to it pursuant to post-petition orders of this Court in its first lien position. Nothing in the Plan or this Confirmation Order shall be construed to terminate or otherwise modify the security interest of Third Coast granted under its loan documents, recorded in its filed UCC-1 Financing Statement, which are acknowledged by the Debtor. The default provisions of the Loan Documents shall control, notwithstanding any provision in the Plan or Confirmation Order to the contrary. The Debtor shall provide quarterly a sworn statement to Third Coast regarding the status of payments under the Plan to the IRS and Williamson County. If the Debtor receives a notice of default from either Williamson County or the IRS, it shall immediately report such notice to Third Coast.

The Class 1 Claim of Third Coast shall be re-amortized for a period of 63 months from the Effective Date and shall accrue interest at 1.75% over prime (fixed as of Feb. 1, 2024) per the terms of the amended note.

The Debtor will execute new loan documentation acceptable to Third Coast to reflect the foregoing obligations, including any documentation necessitated by the brewing agreement with Celis.

The Debtor shall commence payments to Third Coast beginning fourteen (14) days after the Effective Date and shall make monthly payments in equal installments for a period of sixty-three (63) months in an amount sufficient to satisfy the obligation to Third Coast. To the extent that the Debtor liquidates the collateral securing Third Coast's interest, such as the brewing equipment, the Debtor will remit net proceeds to Third Coast Bank. There shall be no pre-payment penaltys and any payments made from liquidated assets shall be allocated against the outstanding principal and not interest.

Third Coast is impaired and entitled to vote.

### Small Business Administration

The Small Business Administration's (the "SBA") Claim is a second-position Claim and shall be treated as fully secured and will be modified. The SBA's Secured Claim includes all allowed pre-petition and post-petition interest (if unpaid on the Effective Date), attorneys' fees, and expenses.

The SBA will maintain and retain all pre-petition collateral and all collateral granted to it pursuant to post-petition orders of this Court in its second lien position.

The terms set forth under that certain Note between the SBA and the Debtor dated June 25, 2020 and that certain 1st Modification of Note Dated April 20, 2022 shall remain unaltered except, however, that the Maturity Date of the Note and 1st Modification of Note shall be modified to reflect a date of September 30, 2052 (the "Modified Maturity Date") and the Debtor's payments thereunder shall be fully re-amortized.

Beginning in the twelfth (12th) full month following the Effective Date, the Debtor shall resume payments under such Note and 1st Modification of Note, as modified thereby, and shall make monthly payments in equal installments sufficient to satisfy the obligations to the SBA thereunder by the Modified Maturity Date

The SBA is impaired and entitled to vote.

**SECURED CLAIMS TO BE TREATED AS UNSECURED CLAIMS UNDER §506(a)**

*Amsterdam Capital, LLC ("Amsterdam")*

*White Road Capital, LLC ("White Road")*

*The Fundworks ("Fundworks")*

*CloudFund, LLC ("CloudFund")*

*WebBank ("WebBank")*

*Bluevine Inc./Celtic Bank Corp. ("Bluevine")*

The above-mentioned creditors (the "Junior Lien Holders") have either filed UCC-1 Financing Statements or Proof of Claims asserting a security interest in various assets of the Debtor. The Debtor believes the Junior Lien Holders have no secured claims pursuant to 11 U.S.C. § 506(a) because the Junior Lien Holders are in a junior lien position with respect to their collateral and the value of such collateral does not exceed the amount of the debt owed to Third Coast and the SBA which the Debtor believes to have valid senior liens attaching to virtually all assets of the Debtor.

To the extent, and only to the extent, any Junior Lien Holder has an Allowed Secured Claim within the meaning of section 506(a): 1) that Junior Lien Holder will retain its lien; 2) the Allowed Secured Claim shall accrue interest at 9.50% per annum; 3) the Debtor's obligations to the Junior Lien Holder shall be modified and fully re-amortized for a period of one hundred and twenty (120) months beginning on January 5, 2026 and the Debtor shall make payments in equal installments thereunder sufficient to fully satisfy the Allowed Secured Claim; and 4) once payments thereunder are complete, the Junior Lien Holder's lien shall be extinguished.

The portion of Junior Lien Holders' Allowed Claims which are unsecured shall be treated as a Class 8 General Unsecured Claim.

In the event any Junior Lien Holder is found to have a fully Unsecured Claim, then any lien of such Creditor on the Debtor's assets shall be extinguished.

Because the Junior Lien Holders will recover pursuant to Class 8, pursuant to 11 U.S.C. 1126(g), the Junior Lien Holders are not deemed to have rejected and is thus impaired and entitled to vote under the Debtor's Plan.

**7.02    Class 2 – Secured Claim of Wells Fargo, N.A.**

Wells Fargo, N.A. ("Wells Fargo") has filed a Secured Claim based upon that certain Lease Agreement entered into between Wells Fargo and the Debtor regarding a forklift (the "Forklift Lease"). The Debtor intends to reject the Forklift Lease and will surrender the forklift to Wells Fargo in full satisfaction of Wells Fargo's claim.

Wells Fargo is impaired and entitled to vote.

**7.03    Class 3 – Secured Claim of LOP Restoration.**

LOP Restoration, LLC ("LOP") has filed a Secured Claim asserting a lien on the Debtor's leasehold interests at the Liberty Hill location.

To the extent that LOP Restoration, LLC ("LOP") has an Allowed Claim, it is fully secured against the Debtor's leasehold interest in the Liberty Hill location and shall be paid without interest in installments as set forth in Exhibit A. Additionally, LOP shall have a security interest in any recovery from the landlord of the Liberty Hill location by the Debtor for the reimbursement of expenses related to the repairs and improvements of the plumbing and roofing at the Liberty Hill location.

Any objection or other request to determine the amount of LOP's Allowed Claim, if any, shall be filed no later than February 29, 2024.

LOP is not deemed to have rejected and is thus impaired and entitled to vote under the Debtor's Plan.

**7.04    Class 4 – Secured Claim of John Nelson, DIP Lender.**

The post-petition Secured Claim of John Nelson as DIP Lender shall be treated as follows:

John Nelson shall retain any lien he has on the Debtor's assets. The indebtedness to John Nelson shall accrue interest at 8% per annum. Beginning on March 1, 2024, the Debtor shall make twelve (12) equal monthly payments to John Nelson in an amount sufficient to satisfy the indebtedness to this Creditor.

At the completion of the payments hereunder, John Nelson's lien on the Debtor's assets shall be extinguished and the obligations arising under that certain Debtor-In-Possession Credit

and Security Agreement dated May 24, 2023 between the Debtor and John Nelson shall be deemed satisfied.

### 7.05    Class 5 - Secured Ad Valorem Taxes.

The Debtor currently estimates this class to consist of one claim (Willaimson County) in the amount of $5,207.

With respect to all Allowed Secured ad valorem taxes, such claims shall be paid in accordance with 11 U.S.C. § 1129(a)(9)(c) with the first payment due and payable on January 31, 2024. The Reorganized Debtor, in its sole discretion, will either pay such Claims: (i) on the Effective Date; or (ii) when such taxes become due and payable under the laws of the applicable taxing jurisdiction; or (iii) in accordance with the Plan payments set forth in Exhibit A.

All Tax Claims shall remain subject to section 505 of the Bankruptcy Code. The Reorganized Debtor shall retain the right to a determination of the amount or legality of any tax pursuant to section 505 of the Bankruptcy Code as to any Tax Claim. The Reorganized Debtor may seek relief pursuant to section 505 of the Bankruptcy Code as a part of, and in conjunction with, any objection to any Tax Claim.

With respect to Allowed Secured or Priority Tax Claims, the interest rate paid upon such Claims shall be the rate of interest determined under applicable non-bankruptcy law.

Post-petition property taxes will be paid when such taxes become due and payable under the laws of the applicable taxing jurisdiction.

Notwithstanding any other provision of this Plan, Williamson County shall retain its 2023 tax liens.

A failure by the Reorganized Debtor to make a payment to a Taxing Authority holding a Priority or Secured Tax Claim pursuant to the terms of the Plan shall be an Event of Default. If the Reorganized Debtor fail to cure an Event of Default as to such payments within ten (10) days after receipt of written notice of default from the holder of a Class 5 Claim, then such holder may exercise any and all rights and remedies the holder of such Class 5 Claim may have under applicable law.

Nothing herein shall prohibit the Reorganized Debtor from selling property secured by a Tax Claim at any time provided that the remaining unpaid portion of the Allowed Secured Claim

of a Taxing Authority holding an interest in the property and attributable to such property shall be paid in full at such time.

This class is not impaired and not entitled to vote.


7.06    **Class 6 - Priority Unsecured Claims**.

The Debtor currently estimates this class to consist of two claims totaling $20,698.05.

Priority Unsecured Claims shall be paid in accordance with 11 U.S.C. § 1129(a)(9)(c) with the first payment due and payable on February 1, 2024. The Reorganized Debtor, in its sole discretion, will either pay such Claims: (i) on the Effective Date; or (ii) when such taxes become due and payable under the laws of the applicable taxing jurisdiction; or (iii) in accordance with the Plan payments set forth in Exhibit A.

All Tax Claims shall remain subject to section 505 of the Bankruptcy Code. The Reorganized Debtor shall retain the right to a determination of the amount or legality of any tax pursuant to section 505 of the Bankruptcy Code as to any Tax Claim. The Reorganized Debtor may seek relief pursuant to section 505 of the Bankruptcy Code as a part of, and in conjunction with, any objection to any Tax Claim.

With respect to Allowed Secured or Priority Tax Claims, the interest rate paid upon such Claims shall be the rate of interest determined under applicable non-bankruptcy law.

Post-petition property taxes will be paid when such taxes become due and payable under the laws of the applicable taxing jurisdiction.

Nothing herein shall prohibit the Reorganized Debtor from selling property secured by a Tax Claim at any time provided that the remaining unpaid portion of the Allowed Secured Claim of a Taxing Authority holding an interest in the property and attributable to such property shall be paid in full at such time.

This class is not impaired and not entitled to vote.


7.07    **Class 7 – General Unsecured Creditors.** Allowed General Unsecured Claims, including deficiency claims, shall receive a pro-rata share of $108,000, which amount shall be paid in monthly payments beginning in Month 28 of the Plan and ending in Month 58 according to the projections listed in the Plan payments set forth on Exhibit A.

Class 7 is impaired and entitled to vote.

**7.08    Class 8 - Allowed Equity Interests in the Debtor**

The equity interest holders in Whitestone Brewery, LLC will retain their interests in the Reorganized Debtor.

<u>Article 8</u>
**Allowance and Disallowance of Claims**

**8.01    Delay of distribution on a Contested Claim**. No distribution will be made on account of a Contested Claim unless such claim is allowed by a Final Order.

**8.02    Settlement of Contested Claims**. The Debtor will have the power and authority to settle and compromise a Contested Claim with court approval and compliance with Rule 9019 of the Federal Rules of Procedure.

**8.03    Filing Objections**. Objections to Claims may be filed with the Bankruptcy Court and served upon each holder of the Claims to which objections are filed not later than sixty (60) days after the Confirmation Date, unless such time period is extended by order of the Court. Notwithstanding anything herein to the contrary, no distribution will be made on account of a Contested Claim unless and until such claim is allowed.

<u>Article 9</u>
**Executory Contracts and Unexpired Leases**

**9.01**  All executory contracts or unexpired leases, not otherwise assumed or rejected by the Debtor prior to confirmation of the Plan, are rejected by the Debtor under the Plan as of the Effective Date, except as otherwise provided under Treatment of Claims in the Plan. Without limitation, Debtor hereby identifies the following unexpired leases or executory contracts as to be assumed along with the estimated cure amounts:

| LEASE | Contract No. if known | Term Remaining | Cure Amount and Proposal |
|---|---|---|---|
| Liberty Hill Lease | | 36 Months | No cure required |
| Toast merchant card agreement | 2c97d22c-3f71-404c-bac7-571f8ded6430 | | No cure required |
| Toast merchant card agreement | 0a180442-4581-4a4d-900c-7cbd933abed0 | | No cure required |

| Distribution Agreement with Brown Distributing | | | No cure required |
|---|---|---|---|
| Jani-King | 695099 | | No cure required |
| Crosby Hops Vendor Agreement | | | No cure required |

**9.02**    A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than 45 days after the date of the order confirming this Plan.

## Article 10
## General Provisions

**10.01   Severability**. If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**10.02   Binding Effect**. Pursuant to 11 U.S.C. § 1141, the provisions of the confirmed Plan shall bind the Reorganized Debtor, the Debtor's Creditors, and the holder of the Equity Interest in the Debtor, whether or not the Claim or Equity Interest is impaired under the Plan and whether or not such Creditor or Equity Interest holder has accepted the Plan.

**10.03   Permanent Injunction**. Confirmation of the Plan shall result in the issuance of a permanent injunction against the commencement or continuation of any judicial, administrative, or other action or proceeding on account of any Claims against the Reorganized Debtor. Other than as set forth in this subsection, from and after Confirmation, all holders of Claims against the Debtor are permanently restrained and enjoined (a) from commencing or continuing in any manner, any action or other proceeding of any kind with respect to any such Claim against the Debtor or the Reorganized Debtor or its assets; (b) from enforcing, attaching, collecting, or recovering by any manner or means, any judgment, award, decree, or order against the Debtor or the Reorganized Debtor or its assets; (c) from creating, perfecting, or enforcing any encumbrance or any kind against the Debtor or the Reorganized Debtor or its assets; (d) from asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due to the Debtor or

the Reorganized Debtor except as may be allowed under the Bankruptcy Code; and (e) from performing any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; *provided, however*, that each holder of a Contested Claim may continue to prosecute its proof of claim in the Bankruptcy Court and all holders of Claims shall be entitled to enforce their rights under the Plan and any agreements executed or delivered pursuant to or in connection with the Plan. Notwithstanding anything in the Plan to the contrary, the Plan shall not limit the Comptroller's setoff rights under 11 U.S.C. § 553. This provision is not admission by any party that such setoff rights exist.

**10.05 Captions**. The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**10.06 Controlling effect**. Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Texas govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**10.07 Retention of Jurisdiction**. Until the Bankruptcy Case is closed, the Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against the Debtor arising prior to the Confirmation Date, to hear and determine all causes of action that exist in favor of the Debtor that arise prior to the Confirmation Date (subject to applicable case law limiting such jurisdiction), to hear and determine all matters relating the administration of what was the Debtor's Estate, to modify the Plan, and to make such other orders as are necessary or appropriate to effectuate the provisions of the Plan in accordance with § 1142 of the Bankruptcy Code, including interpretation and implementation of the Plan and entry of a final decree.

**10.08 Vesting**. On the Effective Date, title to all assets and properties dealt with by the Plan shall vest in Reorganized Debtor, free and clear of all Claims and Interests other than any contractual secured claims granted under any lending agreement, on the condition that Reorganized Debtor complies with the terms of the Plan, including the making of all payments to creditors provided for in such Plan. If Reorganized Debtor defaults in performing under the provisions of this Plan and this case is converted to a case under chapter 7, all property vested in Reorganized Debtor and all subsequently acquired property owned as of or after the conversion date shall re-vest and constitute property of the bankruptcy estate in the converted case.

**10.09 Headings**. The headings and captions used in the Plan are for convenience only

and shall not be deemed to limit, amplify or modify the terms of this Plan nor affect the meaning thereof.

**10.10 Computation of Time**. In computing any time prescribed herein the provision of Fed. R. Bankr. P. 9006(a) shall apply.

**10.11 De Minimus Distributions**. The Reorganized Debtor, will have sole discretion in making monthly payments to the general unsecured creditors and shall not make a distribution to any creditor under $30, unless that distribution results in the final payment to that creditor.

**10.12 Potential Causes of Action**. Unless otherwise specified, the Debtor retains any and all possible causes of action or legal claims that it currently possesses, including, without limitation, any cause of action against: a) Taratino Properties, the landlord of the Liberty Hill location, for a failure to reimburse for paid Tenant Improvements, b) Travis Meriwhether for breach of contract and other causes of action related to the buildout of the Liberty Hill location, and c) David Johnson, Cedar Park Railyards, Inc., and Denise Page for various business torts and damages caused by the lockout from the Cedar Park location and related events.

## Article 11
### Discharge

**11.01 Discharge.** If the Court confirms Debtor's Plan under § 1191(a), then the Debtor will receive a discharge of debts as specified in § 1141(d)(1)(A) of the Code except that the Debtor will not be discharged of any debt: (i) imposed by this Plan; or (ii) to the extent provided in § 1141(d)(6).

If the Plan is confirmed under § 1191(b), then the Debtor shall receive a discharge of all debts provided in § 1141(d)(1)(A) and all other debts allowed under § 503 and provided for in the plan except any debt on which the last payment is due after the last plan payment..

In the event that the plan is confirmed under § 1191(b), the Subchapter V trustee will not serve as a payment agent to the creditors under the Plan; Debtor will disburse payments according to the Plan payments set forth on Exhibit A.

## Article 12
### Default

**12.01 Default in Plan Payments**. Other than with respect to payments to the Texas Comptroller, if the Debtor fails to make a payment to a creditor pursuant to the terms of the Plan by the fifteenth day of the month in which such payment is due, then such a failure shall constitute

an event of default. If there is an event of default, a Creditor must deliver to the Debtor a notice of default. Upon receipt of the notice of default, the Debtor shall have 14 days to cure such default. A Creditor may, upon the occurrence of a third event of default and after three such notices of default, whether such defaults are cured or uncured, accelerate its Allowed Claim(s) and declare the outstanding amount of such Claim(s) to be immediately due and owing and pursue any and all available state and federal rights and remedies.

A failure by the reorganized Debtors to make a payment to the Texas Comptroller pursuant to the terms of the Plan shall be an Event of Default. If the reorganized Debtors fail to cure an Event of Default as to tax payments within ten (10) calendar days after service of written notice of default from the Comptroller, the Comptroller may (a) enforce the entire amount of its claim, (b) exercise all rights and remedies under applicable nonbankruptcy law, and (c) seek such relief as may be appropriate in this court. Notice of the default shall be served by first class mail upon the Debtor: 601 E. Whitestone Blvd., Suite 500, Cedar Park, TX 78613, Attn Chief Executive Officer, and upon Debtor's attorney at: Hayward, PLLC, 7600 Burnet Rd., Suite 530, Austin, TX 78757, Attn: Herbert C. Shelton, Esq.; cshelton@haywardfirm.com.

The Debtors shall be allowed to cure up to two (2) defaults. Upon a third default, the Comptroller, at its option, may declare the default non-curable and proceed to collect the remainder of the debt.

**12.02  Conversion to Chapter 7**. Conversion of the Bankruptcy Cases to Chapter 7 shall be an additional remedy for default.

**12.03 Default to the IRS**. Notwithstanding any other provision herein, the debt owed by the Debtor to the Internal Revenue Service is a non-dischargeable debt, except as otherwise provided for in the Bankruptcy Code, and that if the Debtor should default, the Internal Revenue Service is not subject to the provisions of the Bankruptcy Code so that the Internal Revenue Service can take whatever actions are necessary to collect said debt in the event of default.

A failure by the Debtor to make a payment to the Internal Revenue Service pursuant to the terms of the Plan shall be an event of default, and as to the Internal Revenue Service, there is an event of default if payment is not received by the fifteenth (15th) day of each month. If there is a default, the Internal Revenue Service must send a written demand for payment, and said payment must be

received by the Internal Revenue Service within fifteen (15) days of the date of the demand letter. The Debtor can receive up to three (3) notices of default from the Internal Revenue Service; however, on the third (3rd) notice of default from the Internal Revenue Service, the third (3rd) notice of default cannot be cured, and the Internal Revenue Service may accelerate its allowed claim(s), past and future, and declare the outstanding amount of such claim(s) to be immediately due and owing and pursue any and all available state and federal rights and remedies. These default provisions pertain to the entire claim(s) of the Internal Revenue Service, secured, unsecured priority, unsecured general and administrative priority.

The Internal Revenue Service is bound by the provisions of the confirmed Plan and is barred under Section 1141 of the Bankruptcy Code from taking any collection actions against the Debtor for pre-petition claims during the duration of the Plan (provided there is no default as to the Internal Revenue Service). The period of limitations on collection remains suspended under 26 U.S.C. § 6503(h) for the tax periods being paid under the Plan and terminates on the earlier of (1) all required payments to the Internal Revenue Service have been made; or (2) thirty (30) days after the date of the demand letter (described above) for which the debtor failed to cure the default.

The Debtor's failure to remain current on its ongoing tax obligations shall be an event of default under the terms of the Plan. The Debtor is required to stay current on all ongoing tax reporting/tax payments with the Internal Revenue Service. If the debtor defaults to the Internal Revenue Service (in the timely filing of any future tax return and/or the payment of any ongoing tax liability) this is an event of default to the plan term agreement. The Internal Revenue Service must send a written demand to the Debtor or Reorganized Debtor of the default and the Debtor must cure the default within fifteen (15) days of the date on the demand letter. If the default is not cured within fifteen (15) days, the Internal Revenue Service may assert the balance on the proof of claim still remaining which will include tax, interest and penalty to be due and owing and the entire balance (after crediting all payments made) may go out for collection.

Internal Revenue Service remedies upon default: Upon any final and non-curable default by the Reorganized Debtor, the Internal Revenue Service may accelerate its allowed pre- and post-petition claims (and any future administrative claims), and declare the outstanding amounts of such

claims to be immediately due and owing. The Internal Revenue Service may pursue any and all available state and federal rights and remedies as provided by law without further order of this Court.

      **12.04 Ad Valorem Taxes to Williamson County**. The Debtor is required to stay current on all ongoing tax payments with Williamson County. If the Debtor defaults to Williamson County (in the timely payment of any ongoing tax liability) this is an event of default to the Plan. Williamson County may send a written demand to the Debtor or Reorganized Debtor of the default and the Debtor must cure the default within fifteen (15) days of the date of the demand letter. If the default is not cured within fifteen (15) days, Williamson County may assert the balance on the proof of claim still remaining.

Date: January 5, 2024                    Respectfully submitted,

                                      **WHITESTONE BREWERY, LLC**

                                        By: */s/ Ryan Anglen*
                                        Ryan Anglen
                                        Managing Member

                                      **DRAFTED AND APPROVED:**

                                      */s/ Charlie Shelton*
                                      Charlie Shelton
                                      State Bar No. 24079317
                                      Todd Headden
                                      Bar Number: 24096285
                                      **HAYWARD PLLC**
                                      7600 Burnet Road, Suite 530
                                      Austin, TX 78757
                                      (737) 881-7100
                                      cshelton@haywardfirm.com
                                      theadden@haywardfirm.com

                                      **COUNSEL FOR**
                                      **WHITESTONE BREWERY, LLC**

Whitestone Brewery Plan Exhibit A

| January 2024 - December 2024 | January Budget | February Budget | March Budget | April Budget | May Budget | June Budget |
|---|---|---|---|---|---|---|
| | 1/1/24-1/31/24 | 2/1/24-2/28/24 | 3/1/24-3/31/24 | 4/1/24-4/30/24 | 5/1/24-5/31/24 | 6/1/24-6/30/24 |
| Cash on Hand | $5,006.59 | $4,205.88 | $804.13 | $6,605.07 | $6,156.01 | $12,249.93 |
| Income | | | | | | |
| Taproom Sales | $53,500.00 | $33,700.00 | $70,000.00 | $72,000.00 | $73,000.00 | $73,000.00 |
| Distribution Sales | $1,500.00 | $1,500.00 | $2,500.00 | $2,500.00 | $3,000.00 | $2,500.00 |
| | | | | | | |
| Total Income | **$55,000.00** | **$35,200.00** | **$72,500.00** | **$74,500.00** | **$76,000.00** | **$75,500.00** |
| | | | | | | |
| Cost of Goods Sold | | | | | | |
| Beer Raw Materials - COGS | $0.00 | $0.00 | $2,500.00 | $4,000.00 | $5,000.00 | $5,000.00 |
| Parts & Supplies (Brewery) - COGS | $1,000.00 | $0.00 | $3,500.00 | $6,000.00 | $4,000.00 | $4,000.00 |
| Purchases (Sales) - COGS | $0.00 | $0.00 | $300.00 | $300.00 | $300.00 | $300.00 |
| Purchases (Taproom) - COGS | $200.00 | $200.00 | $600.00 | $600.00 | $600.00 | $600.00 |
| Repair & Maintenance - COGS | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $250.00 |
| Subcontractors | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total Repair & Maintenance - COGS | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Advertising & Marketing | $0.00 | $0.00 | $0.00 | $300.00 | $300.00 | $300.00 |
| Auto - Fuel | $250.00 | $100.00 | $600.00 | $600.00 | $800.00 | $800.00 |
| Auto - Repairs & Maintenance | $0.00 | $0.00 | $100.00 | $100.00 | $100.00 | $100.00 |
| Auto - Vehicle Payments | $0.00 | $680.00 | $680.00 | $680.00 | $680.00 | $680.00 |
| Automobile | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Bank Charges | $30.00 | $30.00 | $30.00 | $30.00 | $30.00 | $30.00 |
| Benefits, Health & Medical | $0.00 | $0.00 | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 |
| Cleaning Services | $200.00 | $200.00 | $600.00 | $600.00 | $700.00 | $700.00 |
| Entertainment | $0.00 | $0.00 | $750.00 | $750.00 | $1,500.00 | $1,500.00 |
| Equipment rental | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Insurance | $1,200.00 | $1,200.00 | $1,600.00 | $1,600.00 | $1,600.00 | $1,600.00 |
| Legal & Professional Fees | $2,250.00 | $1,125.00 | $1,125.00 | $1,125.00 | $1,125.00 | $1,125.00 |
| Meals | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Phone-Alarm-Internet-TV | $350.00 | $350.00 | $1,200.00 | $1,200.00 | $1,200.00 | $1,200.00 |
| Office - Software & POS | $2,000.00 | $275.00 | $800.00 | $800.00 | $800.00 | $800.00 |
| Office -Shipping & Delivery | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Office Expenses | $100.00 | $0.00 | $100.00 | $100.00 | $100.00 | $100.00 |
| Payroll Expenses | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Employee Payroll Toast | $23,000.00 | $12,000.00 | $22,000.00 | $22,000.00 | $22,000.00 | $22,000.00 |
| Petty Cash Expenses | $0.00 | $0.00 | $0.00 | $2,800.00 | $2,800.00 | $2,800.00 |
| Reimbursed Expenses | $0.00 | $0.00 | $400.00 | $400.00 | $400.00 | $400.00 |
| Rent - Repair & Maintenance | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Rent or Lease | $10,942.50 | $12,858.75 | $12,858.75 | $12,858.75 | $12,858.75 | $12,858.75 |
| Rent or Lease of Buildings | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Rent- Utilities | $2,000.00 | $1,000.00 | $1,200.00 | $1,900.00 | $2,100.00 | $2,100.00 |
| Repair and Maintenance | $0.00 | $0.00 | $200.00 | $200.00 | $200.00 | $200.00 |
| Subcontractors | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Suspense | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Taxes & Licenses | $6,000.00 | $4,000.00 | $4,000.00 | $7,500.00 | $8,000.00 | $8,000.00 |
| Tools, Hardware, & Supplies | $0.00 | $0.00 | $100.00 | $100.00 | $100.00 | $2,500.00 |
| Total Expenses | $49,522.50 | $34,018.75 | $57,543.75 | $68,743.75 | $69,493.75 | $72,143.75 |
| Total Other Income | $350.00 | $350.00 | $350.00 | $7,300.00 | $10,300.00 | $10,300.00 |
| Net Income | **$5,827.50** | **$1,531.25** | **$15,306.25** | **$13,056.25** | **$16,806.25** | **$13,656.25** |
| | | | | | | |
| Administrative Expense Payments | $1,000.00 | $1,000.00 | $3,000.00 | $6,000.00 | $3,000.00 | $1,000.00 |
| Payments to Third Coast (Class 1- Est. $153,300) | $4,628.21 | $2,933.00 | $3,156.62 | $3,156.62 | $3,156.62 | $3,156.62 |
| Payments to Small Business Administration (Class 1- Est. $524,000) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Payments to LOP Restoration (Class 3- Disputed) | | | | | | |
| Payments to DIP Lender (Class 4- Est. $27,000) | $0.00 | $0.00 | $2,348.69 | $2,348.69 | $2,348.69 | $2,348.69 |
| Payments to Ad Valorem (Class 5- Est. $5,207.02) | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,207.02 | |
| Payments to Priority Creditors (Class 6-)(Est. 20,698.05) | $0.00 | $0.00 | $0.00 | $1,000.00 | $1,000.00 | $1,000.00 |
| Payments to General Unsecured Creditors (Class 7- Pro-Rata $90,000) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | | | | | | |
| Ending Cash on Hand | $4,205.88 | $804.13 | $6,605.07 | $6,156.01 | $12,249.93 | $18,400.87 |

Whitestone Brewery Plan Exhibit A

| January 2024 - December 2024 | July Budget | August Budget | September Budget | October Budget | November Budget | December Budget | |
|---|---|---|---|---|---|---|---|
| | 7/1/24-7/31/24 | 8/1/24-8/31/24 | 9/1/24-9/30/24 | 10/1/24-10/31/24 | 11/1/24-11/30/24 | 12/1/24-12/31/24 | |
| Cash on Hand | $18,400.87 | $18,410.56 | $27,077.89 | $32,010.22 | $34,410.55 | $35,811.24 | |
| Income | | | | | | | |
| Taproom Sales | $75,000.00 | $75,000.00 | $75,000.00 | $75,000.00 | $75,000.00 | $75,000.00 | |
| Distribution Sales | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | $2,500.00 | |
| | | | | | | | |
| Total Income | **$77,500.00** | **$77,500.00** | **$77,500.00** | **$77,500.00** | **$77,500.00** | **$77,500.00** | |
| | | | | | | | |
| Cost of Goods Sold | | | | | | | |
| Beer Raw Materials - COGS | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | |
| Parts & Supplies (Brewery) - COGS | $800.00 | $800.00 | $800.00 | $800.00 | $800.00 | $800.00 | |
| Purchases (Sales) - COGS | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | |
| Purchases (Taproom) - COGS | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | $600.00 | |
| Repair & Maintenance - COGS | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | $250.00 | |
| Subcontractors | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| Total Repair & Maintenance - COGS | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| Advertising & Marketing | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | $300.00 | |
| Auto - Fuel | $800.00 | $800.00 | $800.00 | $800.00 | $800.00 | $800.00 | |
| Auto - Repairs & Maintenance | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | |
| Auto - Vehicle Payments | $680.00 | $680.00 | $680.00 | $680.00 | $680.00 | $680.00 | |
| Automobile | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| Bank Charges | $30.00 | $30.00 | $30.00 | $30.00 | $30.00 | $30.00 | |
| Benefits, Health & Medical | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 | $2,200.00 | |
| Cleaning Services | $700.00 | $700.00 | $700.00 | $700.00 | $700.00 | $700.00 | |
| Entertainment | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | $1,500.00 | |
| Equipment rental | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| Insurance | $1,600.00 | $1,600.00 | $3,135.00 | $3,135.00 | $3,135.00 | $3,135.00 | |
| Legal & Professional Fees | $1,125.00 | $1,125.00 | $1,125.00 | $1,125.00 | $1,125.00 | $1,125.00 | |
| Meals | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| Phone-Alarm-Internet-TV | $1,200.00 | $1,200.00 | $1,200.00 | $1,200.00 | $1,200.00 | $1,200.00 | |
| Office - Software & POS | $800.00 | $800.00 | $800.00 | $800.00 | $800.00 | $800.00 | |
| Office -Shipping & Delivery | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| Office Expenses | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | |
| Payroll Expenses | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| Employee Payroll Toast | $22,000.00 | $22,000.00 | $24,000.00 | $24,000.00 | $24,000.00 | $24,000.00 | |
| Petty Cash Expenses | $2,800.00 | $2,800.00 | $2,800.00 | $2,800.00 | $2,800.00 | $2,800.00 | |
| Reimbursed Expenses | $400.00 | $400.00 | $400.00 | $400.00 | $400.00 | $400.00 | |
| Rent - Repair & Maintenance | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| Rent or Lease | $30,000.00 | $18,842.36 | $18,842.36 | $18,842.36 | $19,842.00 | $21,000.00 | |
| Rent or Lease of Buildings | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| Rent- Utilities | $2,100.00 | $2,100.00 | $2,300.00 | $2,300.00 | $2,300.00 | $2,200.00 | |
| Repair and Maintenance | $200.00 | $200.00 | $200.00 | $200.00 | $200.00 | $200.00 | |
| Subcontractors | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| Suspense | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| Taxes & Licenses | $8,000.00 | $10,500.00 | $10,500.00 | $10,500.00 | $10,500.00 | $10,500.00 | |
| Tools, Hardware, & Supplies | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | |
| Total Expenses | $79,285.00 | $70,627.36 | $74,362.36 | $74,362.36 | $75,362.00 | $76,420.00 | |
| Total Other Income | $10,300.00 | $10,300.00 | $10,300.00 | $10,300.00 | $10,300.00 | $10,300.00 | |
| Net Income | **$8,515.00** | **$17,172.64** | **$13,437.64** | **$13,437.64** | **$12,438.00** | **$11,380.00** | |
| | | | | | | | **Total** |
| Administrative Expense Payments | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $21,000.00 |
| Payments to Third Coast (Class 1- Est. $153,300) | $3,156.62 | $3,156.62 | $3,156.62 | $3,156.62 | $3,156.62 | $3,156.62 | $39,127.41 |
| Payments to Small Business Administration (Class 1- Est. $524,000) | $0.00 | $0.00 | $0.00 | $2,532.00 | $2,532.00 | $2,532.00 | $7,596.00 |
| Payments to LOP Restoration (Class 3- Disputed) | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $6,000.00 |
| Payments to DIP Lender (Class 4- Est. $27,000) | $2,348.69 | $2,348.69 | $2,348.69 | $2,348.69 | $2,348.69 | $2,348.69 | $23,486.90 |
| Payments to Ad Valorem (Class 5- Est. $5,207.02) | | | | | | | $5,207.02 |
| Payments to Priority Creditors (Class 6-)(Est. 20,698.05) | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 | $9,000.00 |
| Payments to General Unsecured Creditors (Class 7- Pro-Rata $90,000) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | | | | | | | |
| Ending Cash on Hand | $18,410.56 | $27,077.89 | $32,010.22 | $34,410.55 | $35,811.24 | $36,153.93 | |

Whitestone Brewery- Plan Projections

| January 2025-December 2025 | Quarter 1 | Quarter 2 | Quarter 3 | Quarter 4 | | |
|---|---|---|---|---|---|---|
| | Jan 1st-March 31st | April 1st-June 30th | July 1st-Sept. 30th | Oct. 1st - Dec. 31st | | |
| Cash on Hand | $36,153.93 | $31,047.42 | $55,638.29 | $79,729.16 | | |
| **Income** | | | | | | |
| Taproom Sales | $240,000.00 | $250,000.00 | $250,000.00 | $250,000.00 | | |
| Distribution Sales | $13,000.00 | $13,000.00 | $13,000.00 | $13,000.00 | | |
| | | | | | | |
| **Total Income** | **$253,000.00** | **$263,000.00** | **$263,000.00** | **$263,000.00** | | |
| | | | | | | |
| **Cost of Goods Sold** | | | | | | |
| Beer Raw Materials - COGS | $4,200.00 | $4,200.00 | $4,200.00 | $4,200.00 | | |
| Parts & Supplies (Brewery) - COGS | $4,200.00 | $4,200.00 | $4,200.00 | $4,200.00 | | |
| Purchases (Sales) - COGS | $1,050.00 | $1,050.00 | $1,050.00 | $1,050.00 | | |
| Purchases (Taproom) - COGS | $5,775.00 | $5,775.00 | $5,775.00 | $5,775.00 | | |
| Repair & Maintenance - COGS | $1,050.00 | $1,050.00 | $1,050.00 | $1,050.00 | | |
| Subcontractors | $0.00 | $0.00 | $0.00 | $0.00 | | |
| Total Repair & Maintenance - COGS | $0.00 | $0.00 | $0.00 | $0.00 | | |
| Advertising & Marketing | $4,725.00 | $4,725.00 | $4,725.00 | $4,725.00 | | |
| Auto - Fuel | $2,940.00 | $2,940.00 | $2,940.00 | $2,940.00 | | |
| Auto - Repairs & Maintenance | $420.00 | $420.00 | $420.00 | $420.00 | | |
| Auto - Vehicle Payments | $2,050.00 | $2,050.00 | $2,050.00 | $2,050.00 | | |
| Automobile | $0.00 | $0.00 | $0.00 | $0.00 | | |
| Bank Charges | $90.00 | $90.00 | $90.00 | $90.00 | | |
| Benefits, Health & Medical | $6,930.00 | $6,930.00 | $6,930.00 | $6,930.00 | | |
| Cleaning Services | $2,205.00 | $2,205.00 | $2,205.00 | $2,205.00 | | |
| Entertainment | $5,775.00 | $5,775.00 | $5,775.00 | $5,775.00 | | |
| Equipment rental | $0.00 | $0.00 | $0.00 | $0.00 | | |
| Insurance | $9,875.25 | $9,875.25 | $9,875.25 | $9,875.25 | | |
| Legal & Professional Fees | $3,375.00 | $3,375.00 | $3,375.00 | $3,375.00 | | |
| Meals | $0.00 | $0.00 | $0.00 | $0.00 | | |
| Phone-Alarm-Internet-TV | $4,200.00 | $4,200.00 | $4,200.00 | $4,200.00 | | |
| Office - Software & POS | $2,625.00 | $2,625.00 | $2,625.00 | $2,625.00 | | |
| Office -Shipping & Delivery | $0.00 | $0.00 | $0.00 | $0.00 | | |
| Office Expenses | $525.00 | $525.00 | $525.00 | $525.00 | | |
| Payroll Expenses | $0.00 | $0.00 | $0.00 | $0.00 | | |
| Employee Payroll Toast | $77,000.00 | $77,000.00 | $77,000.00 | $77,000.00 | | |
| Tips (paid through Petty Cash) | $8,400.00 | $8,400.00 | $8,400.00 | $8,400.00 | | |
| Petty Cash Expenses | $1,200.00 | $1,200.00 | $1,200.00 | $1,200.00 | | |
| Reimbursed Expenses | $0.00 | $0.00 | $0.00 | $0.00 | | |
| Rent - Repair & Maintenance | $1,575.00 | $1,575.00 | $1,575.00 | $1,575.00 | | |
| Rent or Lease | $60,088.02 | $60,088.02 | $60,088.02 | $63,088.00 | | |
| Rent or Lease of Buildings | $0.00 | $0.00 | $0.00 | $0.00 | | |
| Rent- Utilities | $7,000.00 | $7,000.00 | $7,000.00 | $7,000.00 | | |
| Repair and Maintenance | $1,470.00 | $1,470.00 | $1,470.00 | $1,470.00 | | |
| Subcontractors | $0.00 | $0.00 | $0.00 | $0.00 | | |
| Suspense | $0.00 | $0.00 | $0.00 | $0.00 | | |
| Taxes & Licenses | $35,000.00 | $25,000.00 | $27,500.00 | $27,500.00 | | |
| Tools, Hardware, & Supplies | $0.00 | $0.00 | $0.00 | $0.00 | | |
| Total Expenses | $253,743.27 | $243,743.27 | $246,243.27 | $249,243.25 | | |
| Total Other Income | $30,900.00 | $35,900.00 | $37,900.00 | $37,900.00 | | |
| **Net Income** | **$30,156.73** | **$55,156.73** | **$54,656.73** | **$51,656.75** | | |
| | | | | | Annual Total | Cumulative Total |
| Administrative Expense Payments | $6,000.00 | $6,000.00 | $6,000.00 | $6,000.00 | $24,000.00 | $45,000.00 |
| Payments to Third Coast (Class 1- Est. $153,300) | $9,469.86 | $9,469.86 | $9,469.86 | $9,469.86 | $37,879.44 | $77,006.85 |
| Payments to Small Business Administration (Class 1- Est. $524,000) | $7,596.00 | $7,596.00 | $7,596.00 | $7,596.00 | $30,384.00 | $37,980.00 |
| Payments to LOP Restoration (Class 3- Disputed) | $4,500.00 | $4,500.00 | $4,500.00 | $4,500.00 | $18,000.00 | $24,000.00 |
| Payments to DIP Lender (Class 4- Est. $27,000) | $4,697.38 | $0.00 | $0.00 | $0.00 | $4,697.38 | $28,184.28 |
| Payments to Ad Valorem (Class 5- Est. $5,207.02) | | | | | $0.00 | $5,207.02 |
| Payments to Priority Creditors (Class 6-)(Est. 20,698.05) | $3,000.00 | $3,000.00 | $3,000.00 | $3,000.00 | $12,000.00 | $21,000.00 |
| Payments to General Unsecured Creditors (Class 7- Pro-Rata $90,000) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | | | | | | |
| Ending Cash on Hand | $31,047.42 | $55,638.29 | $79,729.16 | $100,820.05 | | |

Whitestone Brewery- Plan Projections

| | Year 3 | Year 4 | Year 5 | | 2026-2028 Total | Cumulative Total |
|---|---|---|---|---|---|---|
| | January-December 2026 | January-December 2027 | January-Sep 2028 | | | |
| Cash on Hand | $100,820.05 | $169,305.25 | $231,216.21 | | | |
| Income | | | | | | |
| Taproom Sales | $1,050,000.00 | $1,100,000.00 | $1,150,000.00 | | | |
| Distribution Sales | $55,000.00 | $60,000.00 | $65,000.00 | | | |
| | | | | | | |
| Total Income | **$1,105,000.00** | **$1,160,000.00** | **$1,215,000.00** | | | |
| | | | | | | |
| Cost of Goods Sold | | | | | | |
| Cost of Goods Sold | $0.00 | $0.00 | $0.00 | | | |
| Beer Raw Materials - COGS | $20,000.00 | $21,000.00 | $22,050.00 | | | |
| Parts & Supplies (Brewery) - COGS | $20,000.00 | $21,000.00 | $22,050.00 | | | |
| Purchases (Sales) - COGS | $7,500.00 | $7,875.00 | $8,268.75 | | | |
| Purchases (Taproom) - COGS | $22,000.00 | $23,100.00 | $24,255.00 | | | |
| Repair & Maintenance - COGS | $4,000.00 | $4,200.00 | $4,410.00 | | | |
| Subcontractors | $0.00 | $0.00 | $0.00 | | | |
| Total Repair & Maintenance - COGS | $0.00 | $0.00 | $0.00 | | | |
| Advertising & Marketing | $16,000.00 | $16,800.00 | $17,640.00 | | | |
| Auto - Fuel | $11,200.00 | $11,760.00 | $12,348.00 | | | |
| Auto - Repairs & Maintenance | $2,000.00 | $2,100.00 | $2,205.00 | | | |
| Auto - Vehicle Payments | $8,200.00 | $8,200.00 | $0.00 | | | |
| Automobile | $0.00 | $0.00 | $0.00 | | | |
| Bank Charges | $360.00 | $360.00 | $360.00 | | | |
| Benefits, Health & Medical | $28,000.00 | $29,400.00 | $30,870.00 | | | |
| Cleaning Services | $8,400.00 | $8,820.00 | $9,261.00 | | | |
| Entertainment | $25,000.00 | $26,250.00 | $27,562.50 | | | |
| Equipment rental | $0.00 | $0.00 | $0.00 | | | |
| Insurance | $37,620.00 | $39,501.00 | $41,476.05 | | | |
| Legal & Professional Fees | $13,500.00 | $14,175.00 | $14,883.75 | | | |
| Meals | $0.00 | $0.00 | $0.00 | | | |
| Phone-Alarm-Internet-TV | $16,000.00 | $16,800.00 | $17,640.00 | | | |
| Office - Software & POS | $10,000.00 | $10,500.00 | $11,025.00 | | | |
| Office -Shipping & Delivery | $0.00 | $0.00 | $0.00 | | | |
| Office Expenses | $4,000.00 | $4,200.00 | $4,410.00 | | | |
| Payroll Expenses | $0.00 | $0.00 | $0.00 | | | |
| Employee Payroll Toast | $324,000.00 | $348,000.00 | $372,000.00 | | | |
| Tips (paid through Petty Cash) | $33,600.00 | $33,600.00 | $33,600.00 | | | |
| Petty Cash Expenses | $4,800.00 | $5,040.00 | $5,292.00 | | | |
| Reimbursed Expenses | $0.00 | $0.00 | $0.00 | | | |
| Rent - Repair & Maintenance | $6,000.00 | $6,300.00 | $6,615.00 | | | |
| Rent or Lease | $254,595.84 | $268,839.60 | $283,143.36 | | | |
| Rent or Lease of Buildings | $0.00 | $0.00 | $0.00 | | | |
| Rent- Utilities | $28,000.00 | $29,400.00 | $30,870.00 | | | |
| Repair and Maintenance | $5,600.00 | $5,880.00 | $6,174.00 | | | |
| Subcontractors | $0.00 | $0.00 | $0.00 | | | |
| Suspense | $0.00 | $0.00 | $0.00 | | | |
| Taxes & Licenses | $115,000.00 | $120,000.00 | $125,000.00 | | | |
| Tools, Hardware, & Supplies | $4,500.00 | $4,725.00 | $4,961.25 | | | |
| Total Expenses | $1,029,875.84 | $1,087,825.60 | $1,138,370.66 | | | |
| Total Other Income | $151,600.00 | $151,600.00 | $151,600.00 | | | |
| Net Income | **$226,724.16** | **$223,774.40** | **$228,229.34** | | | |
| | | | | | | |
| Administrative Expense Payments | $24,000.00 | $30,000.00 | $30,000.00 | | $84,000.00 | $129,000.00 |
| Payments to Third Coast (Class 1- Est. $153,300) | $37,879.44 | $37,879.44 | $37,879.44 | | $113,638.32 | $190,645.17 |
| Payments to Small Business Administration (Class 1- Est. $524,000) | $30,384.00 | $30,384.00 | $30,384.00 | | $91,152.00 | $129,132.00 |
| Payments to LOP Restoration (Class 3- Disputed) | $24,000.00 | $30,000.00 | $1,172.96 | | $55,172.96 | $79,172.96 |
| Payments to DIP Lender (Class 4- Est. $27,000) | $0.00 | $0.00 | $0.00 | | $0.00 | $28,184.28 |
| Payments to Ad Valorem (Class 5- Est. $5,207.02) | $0.00 | $0.00 | $0.00 | | $0.00 | $5,207.02 |
| Payments to Priority Creditors (Class 6- Est. $20,698.05) | $8,375.52 | $0.00 | $0.00 | | $8,375.52 | $29,375.52 |
| Payments to General Unsecured Creditors (Class 7- Pro-Rata $90,000) | $33,600.00 | $33,600.00 | $33,600.00 | | $100,800.00 | $100,800.00 |
| | | | | | | |
| | | | | | | |
| Ending Cash on Hand | $169,305.25 | $231,216.21 | $326,409.15 | | | |

## Exhibit B- Liquiation Analysis
## Whitestone Brewery, LLC

**Plan Proponent's Estimated Liquidation Value of Unencumbered Assets**

| Assets | | Scheduled Value* | | Liquidation Value as of Aug. 3rd |
|---|---|---|---|---|
| 1 | Cash | $750 | $ | 750.00 |
| 2 | Accounts Receivable | $1,165 | $ | 1,165.00 |
| 3 | Raw Materials | 12,500.00 | $ | 10,000.00 |
| 4 | Misc.[1] | $16,500.00 | $ | 13,200.00 |
| 5 | Finished Goods (Brewed & Packaged) | $250,000.00 | $ | 25,000.00 |
| 6 | Office & Taproom Furniture[3] | $25,625.00 | $ | 20,500.00 |
| 7 | Vehicles[4] | $23,000.00 | $ | 18,400.00 |
| 8 | Equipment/Machinery[5] | $540,270.00 | $ | 243,121.50 |
| 9 | Intellectual Property | $10,450.00 | $ | 10,450.00 |
| | **Total** | **$880,260.00** | **$** | **342,586.50** |

| | | | |
|---|---|---|---|
| Estimated Cost of Broker | | | $34,259.00 |
| Chapter 7 Trustee's Administrative Claims (Estimated) | | $ | 20,379.33 |
| Chapter 7 Trustee's Counsel and Related | | $ | 10,000.00 |
| | *Subtotal* | | *$64,638.33* |
| | **Available to Creditors** | **$** | **277,948.17** |

| | | | |
|---|---|---|---|
| Secured Claims | Third Coast | $ | 153,300.75 |
| | SBA | $ | 524,340.11 |
| | Wells Fargo | $ | 20,435.40 |
| Priority Claims | Texas Comptroller | $ | 6,030.05 |
| | Texas Workforce Commission | $ | 710.80 |
| | Internal Revenue Service | $ | 1,247.62 |
| | Secured and Priority Claims | $ | 706,064.73 |

| | | |
|---|---|---|
| **Balance left for Unsecured Claims in Liquidation scenario** | **$** | **(428,116.56)** |
| vs | | |
| **Distributions for General Unsecured Claims in Chapter 11** | | **$90,000** |

* Per Amended Schedules filed 7.27.23 (Docket No. 87)
     1 Schedule A- #20 & #22 (Excluding actual product)
     2
     3 Schedule A- #43
     4 Schedule A- #47
     5 Schedule A- #50